

## NUMBER 13-07-00558-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

JOHNNY OSCAR VILLARREAL,                                          **Appellant,**

**v.**

THE STATE OF TEXAS,                                              **Appellee.**

### On appeal from the 156th District Court
### of Bee County, Texas.

## MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Vela**
**Memorandum Opinion by Justice Garza**

Appellant, Johnny Oscar Villarreal, was charged by indictment with one count of murder and one count of engaging in organized criminal activity. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1) (Vernon 2003), 71.02(a)(1) (Vernon Supp. 2008). The jury found appellant guilty of both offenses, and the trial court assessed concurrent life sentences in

the Institutional Division of the Texas Department of Criminal Justice ("TDCJ") with no fine.[1]

By four issues on appeal, appellant contends that: (1) the evidence adduced at trial was legally and factually insufficient to sustain his convictions; (2) the trial court erred in denying his entrapment defense; (3) the prosecutor engaged in prosecutorial misconduct by asking leading questions and referencing pre-drawn diagrams, contravening the trial court's instructions; and (4) the trial court erred in admitting evidence of his extraneous offenses.[2] We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 5, 2006, a Bee County grand jury indicted appellant for murder and engaging in organized criminal activity. *See id.* §§ 19.02(b)(1), 71.02(a)(1). The indictment provided that:

> And it is further presented in and to said Court that deadly weapons, to wit: a gun and a knife, was [sic] used or exhibited during the commission of the aforesaid offense and that the Defendant used or exhibited said deadly weapons or was a party to the aforesaid and knew that deadly weapons would be used or exhibited . . . .

Moreover, the indictment contained an enhancement paragraph referencing appellant's previous conviction for felony aggravated assault.

---

[1] Section 19.02 of the penal code provides generally that a conviction for murder constitutes a first-degree felony. TEX. PENAL CODE ANN. § 19.02(c) (Vernon 2003). The jury also concluded that appellant committed the murder as a member of a criminal street gang and assessed punishment pursuant to section 71.02 of the penal code, which provides that if a defendant commits or conspires to commit, among other things, murder as a member of a criminal street gang, the punishment range is one category higher than the most serious offense. *Id.* § 71.02(a)(1), (b) (Vernon Supp. 2008). Therefore, appellant was subject to the punishment range for capital felonies. *See id.* § 12.31(a) (Vernon 2003). Section 12.31(a) of the penal code states that an individual adjudged guilty of a capital felony is subject to the death penalty or life in prison without parole. *Id.*

[2] As allowed by the appellate rules, the State has not filed an appellate brief in response to appellant's contentions. *See Siverand v. State*, 89 S.W.3d 216, 219 (Tex. App.–Corpus Christi 2002, no pet.) ("The Texas Rules of Appellate Procedure require appellant to either file a brief or state that he no longer desires to prosecute the appeal. TEX. R. APP. P. 38.8(b). However, there is no corresponding rule requiring the State to file a brief in response to appellant's brief.").

## 1. State's Evidence

The State called several witnesses to opine on the events leading up to, during, and after the murder of Donald Bonham.  On the evening of April 17, 2005, Bonham attended a dance at the Chick-a-Saw Club (the "Club") in Beeville, Texas.  Bonham, an ex-member of the Hermandad De Pistoleros Latinos ("HPL") gang, had recently been released from prison, where he was serving time for transporting illegal aliens.[3]  Molly Cox, a bartender at the Club, recalled seeing Bonham arriving at the Club at around 11:00 p.m. and wearing a cowboy hat.  Cox remembered that Bonham appeared to be in a happy mood and that they discussed Bonham doing some carpentry work at her house.  Cox recalled that Bonham danced with two girls and spoke to someone "at the end of the pool table." At the Club's closing time, Bonham asked Cox if he could leave out the back door; she denied his request, stating that the back door was for employees only.

Another patron of the Club, Joann Medellin, observed that on the night of the incident, several men would occasionally go into the restroom together.  This appeared odd to Medellin because "you don't usually see boys going—men going into the bathroom at the same time."  As she was leaving the Club, Medellin heard gunfire and saw people running towards the back of the Club.  She observed a man—Bonham—fall down, and she immediately ran inside the Club to call for help.  Medellin, being licensed in CPR, then went to see if Bonham needed help.  As she was helping Bonham, she observed a white van rapidly take off out of the Club's parking lot.

Ruben Maddy Aleman, an admitted HPL member, testified that he was convicted

---

[3] Bonham renounced his membership in the HPL while in prison and initiated the process to extricate himself from the gang.  The record contains testimony that once an individual joins the HPL, he is a member for life; any person attempting to leave the gang would be placed on a list to be killed.  Several witnesses testified that Bonham was "x-ed out," or, in other words, placed on the list to be killed.

of murder and organized crime for his role in the killing of Bonham. *See generally Aleman v. State*, No. 13-07-0049-CR, 2008 Tex. App. LEXIS 2938 (Tex. App.–Corpus Christi Apr. 24, 2008, pet. ref'd) (mem. op., not designated for publication). Ruben stated that he had known appellant since 1989 and that appellant was the leader of the HPL at the time of Bonham's murder. Ruben then recalled a previous incident where he was convicted of public intoxication. In that incident, Ruben attended a bar function with appellant, and appellant directed him and another HPL member to "take care of some business" outside. Prior to going outside, appellant offered Ruben a black .25 caliber handgun; however, Ruben told him that he did not need a gun. Subsequently, a fight ensued, and Ruben was arrested for public intoxication.

As to the night in question, Ruben testified that he accompanied others, including his nephew John Phillip Aleman, to a dance at the Club. Ruben remembered that the Club was quite crowded that evening and that appellant attended with his wife and Joe Quin Villarreal, among others. Appellant later asked Ruben if he wanted to "take out" Bonham. Ruben declined, so appellant then went to the restroom. Joe Quin and John Phillip accompanied appellant in the restroom. Ruben also followed the group into the restroom and observed appellant trying to give an old .22 caliber pistol, referred to as the "ugly duckling," to John Phillip. Ruben recognized this handgun as Joe Quin's. Upon seeing John Phillip accept the gun from appellant, Ruben took it and gave it back to appellant. Ruben did not want John Phillip getting involved; however, John Phillip subsequently made repeat trips to the restroom to meet with appellant.

As he left the Club, Ruben noticed that appellant, Joe Quin, John Phillip, and Bonham were already fighting. Bonham screamed out for Ruben to help while appellant and Joe Quin were hitting him repeatedly. Ruben then saw appellant and John Phillip stab

4

Bonham with knives. John Phillip used a hook knife to stab Bonham; Ruben did not believe that appellant's knife was left at the scene. Ruben intervened to help Bonham, but Ruben ended up getting cut on his lip by Bonham. Ruben recalled that Bonham was wearing the cowboy hat that was found at the scene. Ruben tried to help Bonham flee, but they tripped and Bonham fell on top of Ruben. As he was falling, Joe Quin shot Bonham. After Ruben pushed Bonham off of him, Joe Quin shot Bonham a second time. Ruben then saw appellant run from the scene and get into a white van.[4]

Contrary to appellant's allegations, Ruben denied bragging about his participation in the murder of Bonham. Ruben also denied appellant's assertion that Ruben took it upon himself to "take out" Bonham without any direction from appellant.

Joe Quin testified that he participated in the murder of Bonham. Joe Quin was told by several HPL members that appellant was the leader of the HPL in the Beeville area. Joe Quin first met appellant at a barbecue in 2005. Shortly thereafter, Joe Quin began selling marihuana for appellant. Joe Quin sold the marihuana for over a year even though he still was not a member of the HPL. Eventually, Joe Quin was made a member of the HPL after appellant and appellant's brother read him the rules and regulations of the HPL.

On the night of Bonham's murder, Joe Quin stated that he went to the Club for a tejano dance. He planned to meet up with appellant and other HPL members. Once appellant arrived, he instructed Joe Quin to keep an eye on Bonham to make sure that Bonham did not leave. Appellant later told Joe Quin that "we had to get this guy [Bonham], that we had to take him out" and provided Joe Quin with the gun used to shoot Bonham. Joe Quin testified that appellant kept all the guns for the HPL members to ensure that "we

---

[4] Ruben testified that appellant's wife was waiting for appellant in the white van.

5

were always ready for something." Prior to the Club's closing, Joe Quin met with appellant and John Phillip in the restroom. Joe Quin noted that appellant first instructed John Phillip to take Bonham out, but John Phillip refused to do so. Appellant then gave Joe Quin the .22 caliber pistol and told him that he "was next in line to show [his] true colors" and that by taking Bonham out, it was his "ticket to get all the way in." Joe Quin subsequently took the gun from appellant.

Per appellant, Joe Quin was to first provoke Bonham to get him to go outside the Club. Joe Quin told Bonham that he had "a very personal problem about him [Bonham] and that we have to take care of it." Bonham did not know Joe Quin, but he met Joe Quin outside a few minutes later. Once Bonham got outside, Joe Quin called him over to some trees that surrounded the Club. Shortly thereafter, appellant and several other gang members came outside and "rushed" Bonham. Joe Quin noticed that appellant's wife went to position the white van for a quick getaway. He also heard Ruben scream after getting cut and saw appellant holding Bonham's arm while others were stabbing Bonham. Appellant then instructed Joe Quin "[t]o do [his] job." While standing over Bonham's body, Joe Quin shot Bonham twice. Joe Quin then saw appellant run towards the white van and take off.

Joe Quin testified that he observed that appellant had a knife that night. Appellant called Joe Quin the next day to ask if he "was okay, if I had been cut or anything, if I had talked to anybody, if I had stashed the gun, if I wanted to go into town, if I wanted to hide out or anything." Joe Quin was eventually arrested and convicted for his role in the murder of Bonham.

Officer Jason Alvarez, Sergeant Mike Willow, and Sergeant Kevin Behr conducted the investigation of the crime scene. They recovered two knives outside the Club: a

6

brown-handled knife and a silver hooked knife. They also found .22 caliber brass casings in the roadway by the Club, a cell phone, and a cowboy hat.[5] Standard police protocol was followed in the collection of the evidence. Each testified that there was significant amounts of blood at the crime scene, but no eyewitnesses came forward to describe the attack or to identify appellant. The knives and the brass casings were sent off for analysis; however, tests conducted on the items were inconclusive.

Lieutenant Reagan Scott, a narcotics investigator, testified that he arrived at the crime scene at 1:26 a.m. and that he assisted in the investigation. He further testified that he had dealt with appellant on numerous occasions when he was working as a patrolman. Lieutenant Scott recalled an incident transpiring on February 19, 2005, whereby appellant, Ruben, and appellant's wife, Anne Marie Villarreal, were arrested at the local Poppy's Club. Appellant was charged with possession of a firearm by a felon;[6] Ruben was charged with public intoxication; and Anne Marie was charged with possession of marihuana and public intoxication. Appellant agreed to work with Lieutenant Scott as a confidential informant "to work off his wife's case." Appellant assisted Lieutenant Scott as an informant on narcotics cases in "Nueces County, Mathis, and in the Five Points area." Appellant openly admitted that he was an HPL member, and TDCJ records did not reveal that appellant had attempted to get out of the HPL through the prison system.[7] Lieutenant Scott testified that

---

[5] It was later established that the cowboy hat found at the crime scene belonged to Bonham.

[6] Because he had previously been convicted of felony aggravated assault, Lieutenant Scott testified that appellant was not permitted to possess a firearm at the time of the incident.

[7] With respect to the Texas Department of Criminal Justice's ["TDCJ"] program for gang members wanting to leave the gang, Lieutenant Scott noted the following:

> The TDCJ offers a system to assist gang members to actually separate themselves from the gang. They will offer them funds to have their tattoos covered and assist them in programs to help them understand ways to get away from the gang community and separate themselves from gang activities.

confidential informants were not immune from the law and that they would be arrested and prosecuted for engaging in criminal activities.

About thirty minutes after he had arrived at the crime scene, Lieutenant Scott called appellant on his cell phone to find out if appellant had any information about the murder. Appellant, however, did not answer his cell phone, so Lieutenant Scott left appellant a message. Appellant did not return Lieutenant Scott's phone call until 12:00 p.m. that day. When appellant returned Lieutenant Scott's phone call, he stated that he knew why Lieutenant Scott was calling. Appellant admitted that he was at the dance that night and that he had witnessed the assault on Bonham. Appellant accused John Phillip, Ruben, and Joe Quin—all HPL members—of killing Bonham.

Lieutenant Scott then got appellant to engage in a recorded telephone conversation with Joe Quin. In this conversation, Joe Quin admitted to shooting Bonham. Law enforcement subsequently conducted a search of Joe Quin's house and vehicle pursuant to a warrant and based on their findings, arrested Joe Quin.[8] Appellant called Lieutenant Scott a few days later to inform him of Ruben's whereabouts and stated that Ruben was injured during the altercation with Bonham. Ruben was later arrested, and at first, he denied being involved in Bonham's killing.

Lieutenant Scott, also a gang expert, testified that several gang members identified appellant as the leader of the HPL in the Beeville area at the time Bonham was murdered. Lieutenant Scott also testified that:

> According to the rules and structure of the prison gang which folds into when

---

Furthermore, the TDCJ maintains a list of individuals that are marked as ex-gang members.

[8] In searching Joe Quin's vehicle, law enforcement found a .38 caliber pistol, a stolen Benelli shotgun, a scale, a box of ammunition, and some marihuana. Also found in Joe Quin's vehicle was a copy of the rules and regulations of the HPL.

they are out of prison to a criminal street gang, they are required to have authorization from command authority to commit a violent act. They have to—they are trying to prevent wars with other gangs, et cetera, so to go out and hurt someone you actually have to have permission to do that except for the fact if it's in defense of your own person or a fellow gang member.

Moreover, Lieutenant Scott noted that HPL members were not permitted to go out on their own and beat someone up and that members would have to discuss a potential assault with gang members in order to obtain permission.[9] Finally, he stated that HPL would regularly conduct meetings at appellant's house and that a knife would be considered a deadly weapon.

Ray Fernandez, M.D., Nueces County medical examiner, conducted an autopsy on Bonham. He noted that "[t]here was a total of 14 sharp-forced injuries which are cut type wounds or stab type wounds" on Bonham's body.[10] Bonham also had numerous bruises on his body. Dr. Fernandez testified that he removed two bullets from Bonham's body. As a result of his examination, Dr. Fernandez determined that "[t]he cause of death was multiple gunshot wounds and sharp-forced injuries."[11]

---

[9] Former prison gang investigator Clemente Rodriguez testified that the HPL had a hierarchy structure in that they had:

generals, captains and—majors, captains, lieutenants[,] and all down the line. Those in ranking positions will give out orders to lower ranking members to carry out whatever activity they want done. . . . [T]hey [lower ranking members] c[ould] be disciplined for not—you know, for not following the rules. One of the rules is to follow the orders of the ranking structure.

Rodriguez further testified that it would take a member of high rank in the HPL to order the killing of another.

[10] Lisa Harmon Baylor, a forensic scientist for the TDCJ Crime Laboratory in Corpus Christi, confirmed Dr. Ray Fernandez's findings, but noted that appellant was ruled out as a contributor to the crime due to a lack of DNA evidence found at the scene. Oscar Rivera, a Texas Ranger, later explained that no fingerprints were obtained from the knives or the brass casings because the knives had smudges which could not be identified and the brass casings got too hot during the discharge from the gun, which dissipated the moisture of the fingerprint ridge.

[11] Dr. Fernandez described "sharp-forced injuries" as "blunt-force injuries where it's a blunt surface that is impacted against the body or hitting against the body, and then sharp force is where there is a sharp edge type weapon that is making the cuts or stab wounds on the body."

Jaime Alvarado, a convicted felon, testified that he knew appellant and that appellant was the leader of HPL for some period of time dating back to at least 2004. Alvarado obtained cocaine from appellant on several occasions. On one such occasion, appellant expressed that he wanted Alvarado to "take care of"—or, in other words, to kill—Bonham. Alvarado declined to participate. Alvarado noted that in February 2005, on Super Bowl Sunday, he attended a party at appellant's house. While there, appellant again asked Alvarado if he knew who Bonham was. Alvarado replied "yeah." Appellant then stated that "we really need to take care of him [Bonham]." Shortly thereafter, Ruben, also an attendee of the party, stated that it was time for Alvarado to "show [his] true colors." Again, Alvarado declined to participate. Alvarado then testified that appellant regularly carried a .22 caliber pistol on his person. Alvarado's testimony was not procured pursuant to a plea deal.

### 2. Appellant's Evidence

Jim Gilder testified on appellant's behalf. Gilder stated that he was incarcerated in the Bee County jail with Joe Quin, John Phillip, and Ruben. John Phillip and Ruben told Gilder that Joe Quin was the shooter. John Phillip was supposed to be the shooter, but Joe Quin took the gun from him. John Phillip told Gilder that they would have gotten away with the murder "if only Joe Quin had kept quiet." Gilder also had a conversation with Joe Quin while he was cutting Joe Quin's hair. Joe Quin admitted that he was the shooter; however, he also noted that appellant "set up the murder." John Phillip and Ruben also stated to Gilder that appellant "set up the murder." Gilder also mentioned that Ruben and Joe Quin were conspiring to get appellant in trouble for the murder.

On cross-examination, Gilder admitted that he was "going to catch chain to TDC" because of convictions for burglary of a habitation and possession of a controlled

10

substance. Gilder then read from a statement that he gave to police regarding his conversations with John Phillip, Ruben, and Joe Quin:

> "John Phillip Aleman and Ruben Maddy Aleman told me on the night of the murder they had been drinking and doing cocaine. They said that they got a call from Johnny Villarreal and he said that they had a meeting at the Chick-a-Saw Club."
>
> . . . .
>
> "Ruben Maddy Aleman called Joe Quin Villarreal to come over and drink some beer because he had to talk to John Phillip Aleman and Joe Quin Villarreal together to see if they are going to be ready for the night."
>
> . . . .
>
> "Joe Quin Villarreal showed up and John Phillip Aleman said that he was ready if Joe Quin was ready. And Ruben Maddy Aleman told them that he would be there to watch everything go down."
>
> . . . .
>
> "Ruben Maddy Aleman told me that he would have got[ten] away with it if it would have been just John Phillip Aleman and Joe Quin Villarreal, but he said there was too many people that knew about it. John Aleman told me that he will beat the case because Ruben Maddy Aleman is going to take the blame for him. Joe Quin Villarreal told me that he was the shooter because he was bragging saying that John Phillip Aleman and Ruben Maddy Aleman just watched, but Ruben Maddy Aleman told me that he was the one who gave the gun to Joe Quin Villarreal and all he had to do was watch as Joe Quin Villarreal and John Phillip Aleman did the job."

Appellant also attempted to call a "Murray Johnson" to testify on his behalf, but Johnson declined to testify for fear of retaliation. The defense then rested.

## II. SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant argues that the evidence supporting his convictions was legally and factually insufficient. Specifically, appellant argues that the only evidence connecting him to the murder was obtained with "co-defendant testimonies" which were not corroborated.

11

## 1. Standard of Review

In conducting a legal sufficiency review, we view the relevant evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)); *Escamilla v. State*, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, nor do we substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000); *Beckham*, 29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151.

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or the jury's verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). This Court will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Id.* at 417.

The State is not required to present direct evidence, such as eyewitness testimony, to establish guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214

12

S.W.3d at 13; *Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *Guevara*, 152 S.W.3d at 49.

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under a hypothetically correct jury charge, a person commits murder if he "intentionally and knowingly causes the death of an individual" or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused death. TEX. PENAL CODE ANN. § 19.02(b)(1). Moreover, a person engages in illegal organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, he commits or conspires to commit . . . murder . . . ." *Id.* § 71.02(a)(1).

## 2. Discussion

### a. The Charge

In this case, the jury could convict appellant of murder if, based on the evidence, they believed beyond a reasonable doubt that on or about April 17, 2005, in Bee County, Texas, either:

> . . . JOHNNY OSCAR VILLARREAL, did then and there as a member of a criminal street gang to wit: Hermandad De Pistoleros Latinos, intentionally or knowingly, cause the death of Donald Wesley Bonham by shooting and stabbing said Donald Wesley Bonham with a knife and a firearm, as alleged in Paragraph 1 of Count 2 of the Indictment;

> OR

> . . . JOHNNY OSCAR VILLARREAL, did then and there, with the intent to

13

establish, maintain, or participate in a combination, intentionally or knowingly, commit the offense of murder by causing the death of Donald Wesley Bonham by shooting and stabbing said Donald Wesley Bonham with a knife and a firearm, as alleged in Paragraph 2 of Count 2 of the Indictment . . . .

### b. The Accomplice-Witness Rule

Article 38.14 of the code of criminal procedure provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005); *see Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). In conducting a sufficiency review under the accomplice-witness rule, a reviewing court must eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001) (citing *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993); *Thompson v. State*, 691 S.W.2d 627, 631 (Tex. Crim. App. 1984)).

The non-accomplice evidence need not directly link the defendant to the crime, nor must if be sufficient to establish guilt beyond a reasonable doubt; rather, the standard is only that it have a tendency to connect the defendant to the crime. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). While the defendant's mere presence at the crime scene is not sufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. *Trevino v. State*, 991 S.W.2d 849, 851-52 (Tex. Crim. App. 1999).

After eliminating from consideration the testimony of Ruben and Joe Quin, both accomplices in the murder of Bonham, a review of the record reveals inculpatory evidence

14

which tends to link appellant with the murder of Bonham. Medellin testified that she observed an odd pattern of several men going to the restroom together and a white van—the same van identified as appellant's getaway vehicle—speed out of the Club's parking lot. Lieutenant Scott testified that appellant admitted to him that he was an HPL member and that he witnessed the attack on Bonham. Lieutenant Scott, a gang expert, also noted that several HPL members identified appellant as a leader of the HPL in the Beeville area and that according to the hierarchy of the HPL, members were not allowed to assault another without permission from high ranked HPL members. Both Ruben and Joe Quin were of lower rank in the HPL than appellant.

Moreover, Gilder, a witness for the defense, testified that Joe Quin and Ruben told him that they committed the murder of Bonham, but that appellant "set up the murder." In addition, Alvarado, not an accomplice to Bonham's murder, stated that appellant had expressed a desire to have Bonham killed. In fact, Alvarado testified that appellant asked him to commit the offense. Finally, Alvarado, a regular buyer of cocaine from appellant, noted that appellant regularly carried a .22 caliber pistol—the same gun used by Joe Quin to shoot Bonham—on his person at all times. Based on this testimony, we conclude that there was sufficient evidence to connect appellant with the commission of the offense. *See Solomon*, 49 S.W.3d at 361.

### c. Law of the Parties

The charge authorized appellant's conviction as a party to the murder pursuant to section 7.02(a)(2) of the penal code. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003).

### i. Section 7.02(a)(2) of the Texas Penal Code

Section 7.02(a)(2) states that: "A person is criminally responsible for an offense by

the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ." *Id.* § 7.02(a)(2). Thus, in order to convict appellant of murder under section 7.02(a)(2), the State had to prove that he aided and abetted Ruben and Joe Quin with respect to each element of the offense. *Woods v. State*, 749 S.W.2d 246, 248 (Tex. App.–Fort Worth 1988, no pet.).

### ii. Legal and Factual Sufficiency of the Evidence
### to Support a Conviction Under Section 7.02(a)(2)

"Evidence is sufficient to support a conviction under the law of parties where the actor is physically present at the commission of the offense, and encourages the commission of the offense either by words or other agreement." *Burdine v. State*, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986); *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). The evidence must show that, at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose. *Burdine*, 719 S.W.2d at 315. In determining whether a defendant participated in an offense as a party, the court may examine the events occurring before, during, and after the commission of the crime and may rely on the defendant's actions that show an understanding and common design to commit the crime. *Burdine*, 719 S.W.2d at 315; *Cordova*, 698 S.W.2d at 111; *Beier v. State*, 687 S.W.2d 2, 4 (Tex. Crim. App. 1985).

The record contains testimony that appellant, a leader of the HPL, instructed Joe Quin and other HPL members to kill Bonham. *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2), 71.02(a)(1). Joe Quin and Ruben both testified that appellant provided the gun used in the murder and that appellant actively participated in Bonham's killing. *See id.* §§ 19.02(b)(1), 71.02(a)(1). Moreover, several witnesses testified that they saw appellant at the Club that

16

night, that appellant repeatedly expressed a desire to have Bonham killed, and that appellant conducted a meeting to discuss how they were going to kill Bonham. *See id.* §§ 7.02(a)(2), 19.02(b)(1), 71.02(a)(1). There was also testimony provided that appellant met with Joe Quin, Ruben, and John Phillip in the restroom of the Club and that appellant encouraged the individuals to "take care" of Bonham. *See id.* § 7.02(a)(2).

On the other hand, Gilder testified that Ruben and Joe Quin committed the murder without appellant's actual participation and that both Ruben and Joe Quin conspired to get appellant in trouble for the murder. However, as previously mentioned, Gilder admitted that both Ruben and Joe Quin told him that appellant "set up the murder."

The jury was the exclusive judge of the facts proved and of the weight to be given to the testimony. TEX. CODE CRIM. PROC. ANN. art. 38.04. Therefore, the jurors were free to accept or reject any or all of the witnesses' testimony. *See Davila v. State*, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Alvarado v. State*, 818 S.W.2d 100, 105 (Tex. App.–San Antonio 1991, no pet.)); *see also Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008) ("The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record."). In convicting appellant, the jury obviously accepted the aforementioned testimony offered by the State and rejected the testimony offered on appellant's behalf. We must defer to the jury's determination. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.") (citing *Jackson*, 443 U.S. at 326).

Based on the foregoing, we conclude that the cumulative force of all the incriminating circumstances is sufficient to support appellant's convictions for Bonham's

17

murder and engaging in organized criminal activity. *See Hooper*, 214 S.W.3d at 13; *see also Guevara*, 152 S.W.3d at 49. Moreover, the verdict is not against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-15. Appellant's first issue is overruled.

## III. ENTRAPMENT

In his second issue, appellant contends that he "was entitled to entrapment as a defense as a matter of law since he help[ed] law enforcement obtain the suspects in the murder of Bonham."

### 1. Standard of Review

When appellant raised the defense of entrapment at trial, he had the burden of producing evidence to establish every element of that defense. *See Hernandez v. State*, 161 S.W.3d 491, 497 (Tex. Crim. App. 2005). He had to present a prima facie case that: (1) he engaged in the conduct charged; (2) because he was induced to do so by a law enforcement agent; (3) who used persuasion or other means; and (4) those means were likely to cause persons to commit the offense. *See id.*; *see also* TEX. PENAL CODE ANN. § 8.06(a) (Vernon 2003). Once he made a prima facie showing of each element, the State then had the burden of persuasion to disprove entrapment beyond a reasonable doubt. *See Hernandez*, 161 S.W.3d at 498. A review of the jury's rejection of an entrapment defense focuses on the legal sufficiency of the evidence. *See Resendez v. State*, 160 S.W.3d 181, 188-89 (Tex. App.–Corpus Christi 2005, no pet.).

When an entrapment defense is presented at trial, the fact-finder is authorized to weigh the evidence and draw a conclusion as to whether the evidence establishes entrapment as a matter of fact or law. *Hernandez*, 161 S.W.3d at 500. In reviewing a jury's rejection of an entrapment defense, we determine whether, viewing the evidence in

the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the criminal offense beyond a reasonable doubt and also could have found against the defendant on the issue of entrapment beyond a reasonable doubt. *Id.* This review must take into account that the trier of fact, not the appellate court, was free to accept or reject all or any portion of any witness's testimony. *Id.* In cases where the entrapment defense is asserted, the fact-finder may disbelieve some or all of a witness's testimony even when that testimony is uncontradicted. *See id.* at 501.

## 2. Discussion

Here, appellant denied committing any offense, which is inconsistent with entrapment. *See Norman v. State*, 588 S.W.2d 340, 345 (Tex. Crim. App. 1979) ("The defense of entrapment is not available to a defendant that [d]enies the commission of the offense."). Moreover, appellant failed to demonstrate how law enforcement induced him to commit the murder of Bonham. *See Hernandez*, 161 S.W.3d at 497; *see also* TEX. PENAL CODE ANN. § 8.06(a). Appellant merely takes issue with the fact that he provided information to law enforcement that apparently contributed, in some degree, to his own undoing. Lieutenant Scott testified that confidential informants were not immune from prosecution in exchange for their cooperation. In addition, the record does not contain any motion filed by appellant in the trial court specifically seeking to include an instruction on entrapment in the jury charge. *See* TEX. R. APP. P. 33.1(a)(1); *see also Hernandez*, 161 S.W.3d at 498 ("Normally, a defense such as entrapment is a question for the jury to decide because it is determined largely by weighing facts and assessing credibility."). We therefore have no basis to conclude that the trial court erred in failing to include an entrapment instruction in the jury charge.

In addition, appellant appears to urge that the trial court should have determined

19

that appellant was entrapped as a matter of law at a pretrial suppression hearing. The court of criminal appeals noted the following with respect to the trial court's determination of the factual issue of entrapment as a matter of law:

> Our's state's reticence to decide the factual issue of entrapment by means of a pretrial motion is in accord with federal entrapment law. *See, e.g., Mathews v. United States*, 485 U.S. 58[, 63] (1988) ("The question of entrapment is generally one for the jury, rather than for the court."); *United States v. Kurkowski*, 281 F.3d 699, 701 (8th Cir. 2002) ("[T]o show entrapment as a matter of law, the evidence must clearly show the government agent developed the criminal plan and that the defendant was not predisposed to commit the crime independent of the government's activities."); *United States v. Tucker*, 133 F.3d 1208, 1217 (9th Cir. 1998) ("To establish [inducement] as a matter of law, the defendant must point to undisputed evidence making it patently clear that [the government induced] an otherwise innocent person . . . to commit the illegal act by trickery, persuasion, or fraud of a government agent."); *United States v. Lampley*, 127 F.3d 1231, 1243 (10th Cir. 1997) ("Entrapment as a matter of law exists only when there is undisputed evidence which shows conclusively and unmistakably that an otherwise innocent person was induced to commit the act.") (internal quotations omitted); *Coronado v. United States*, 266 F.2d 719, 721 (5th Cir. 1959) ("[E]ntrapment is a jury question unless evidence is so clear and convincing that the matter can be passed on by the court as a matter of law.").

*Hernandez*, 161 S.W.3d at 499 n.12. At the pretrial suppression hearing, appellant, though not specifically referencing the defense of entrapment, did not present undisputed evidence that conclusively showed that the government induced him, an otherwise innocent person, to commit the murder of Bonham. *See id.* Therefore, we cannot say that the trial court abused its discretion in denying appellant's motion for suppression with respect to entrapment. Accordingly, appellant's second issue is overruled.

## IV. LEADING QUESTIONS, THE USAGE OF PRE-DRAWN DIAGRAMS, AND PREJUDICE

In his third issue, appellant contends that the prosecutor asked leading questions over the trial court's instructions to refrain from doing so and used pre-drawn diagrams for purposes other than demonstration. According to appellant, these actions substantially

20

prejudiced his case.

## 1. Standard of Review

Leading questions are questions that suggest the desired answer. *See Tinlin v. State*, 983 S.W.2d 65, 70 (Tex. App.–Fort Worth 1998, pet. ref'd). Rule 611(c) of the Texas Rules of Evidence states that leading questions may be used on the direct examination of a witness as necessary to develop his testimony. TEX. R. EVID. 611(c). Permitting leading questions on direct examination is a matter within the sound discretion of the trial court. *Wyatt v. State*, 23 S.W.3d 18, 28 (Tex. Crim. App. 2000); *see Navajar v. State*, 496 S.W.2d 61, 64 (Tex. Crim. App. 1973); *see also Wise v. State*, 223 S.W.3d 548, 558 (Tex. App.–Amarillo 2007, pet. ref'd). The trial court does not abuse its discretion in allowing such questions unless appellant can show that he was unduly prejudiced by virtue of the questions. *Navajar*, 496 S.W.2d at 61; *Wise*, 223 S.W.3d at 558. More importantly, error in allowing leading questions seldom results in reversible error. *See Uhl v. State*, 479 S.W.2d 55, 57 (Tex. Crim. App. 1972); *see also Moblin v. State*, No. 07-07-0175-CR, 2008 Tex. App. LEXIS 4613, at *6 (Tex. App.–Amarillo June 24, 2008, no pet.) (mem. op., not designated for publication).

## 2. Discussion

Counsel for appellant objected to the State's usage of leading questions numerous times; many of these objections were sustained by the trial court. In sustaining the objections of appellant's counsel, the trial court instructed the State to not ask leading questions. However, the State continued to ask leading questions of its witnesses on several occasions.

On appeal, appellant argues that "the prosecutor's continuance to ask leading questions even after instruction from the court created substantial prejudice against

21

Villarreal during his trial because evidence was being fed to witnesses by the [S]tate." However, appellant fails to explain exactly how his case was substantially prejudiced by the State's leading questions. *See* TEX. R. APP. P. 38.1(h); *see also Navajar*, 496 S.W.2d at 61; *Wise*, 223 S.W.3d at 558. In any event, the record does not demonstrate that the State was feeding evidence to her witnesses; instead, the State was merely trying to develop testimony as allowed by rule 611(c) of the rules of evidence. *See* TEX. R. EVID. 611(c).[12] Based on the record before us, we cannot say that appellant has shown that his case was substantially prejudiced by the State's usage of leading questions. *See Navajar*, 496 S.W.2d at 61; *Wise*, 223 S.W.3d at 558; *see also Uhl*, 479 S.W.2d at 57; *Moblin*, 2008 Tex. App. LEXIS 4613, at *6.

In addition, the trial court allowed the State to use "pre-draw[n] diagrams" of the Club to explain the geographical locations of the Club's occupants at various times on the night of Bonham's murder. The diagrams were allowed for demonstrative purposes only; they were neither offered nor admitted into evidence. *See Markey v. State*, 996 S.W.2d 226, 231 (Tex. App.–Houston [14th Dist.] 1999, no pet.) (noting that the trial court's discretion to permit the use of visual aids, charts, and diagrams during trial is well-established); *see also Pitre v. State*, No. 09-95-140-CR, 1997 Tex. App. LEXIS 3883, at **4-5 (Tex. App.–Beaumont July 23, 1997, no pet.) (mem. op., not designated for publication) (stating that diagrams can be used for demonstrative purposes to clarify testimony).

On appeal, appellant contends that the diagrams conveyed hearsay evidence over defense counsel objections. However, Texas courts have not treated demonstrative

---

[12] The trial court did not sanction the State's prosecutor or hold her in contempt for repeatedly asking leading questions after being instructed not to do so.

22

evidence, whether it be a map, model, drawing, chart, or diagram, as inadmissible hearsay. *See Pierce v. State*, 777S.W.2d 399, 413 (Tex. Crim. App. 1989); *Clay v. State*, 592 S.W.2d 609, 613 (Tex. Crim. App. 1980); *Mayfield v. State*, 848 S.W.2d 816, 819 (Tex. App.–Corpus Christi 1993, pet. ref'd); *see also Pitre*, 1997 Tex. App. LEXIS 3883, at *4. Furthermore, appellant has not adequately explained how the diagrams substantially prejudiced his case or what hearsay evidence was admitted over objection. *See* TEX. R. APP. P. 38.1(h). Appellant's third issue is overruled.

## V. APPELLANT'S EXTRANEOUS OFFENSES

In his fourth issue, appellant takes issue with the admission of Alvarado's testimony that appellant was a drug dealer and a gang member. Specifically, appellant asserts that the admission of Alvarado's testimony constituted unfair prejudice since "no drug [was] involved in the murder of Bonham."

### 1. Standard of Review

The trial court is given wide latitude to admit or exclude evidence of extraneous offenses. *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (en banc); *Poole v. State*, 974 S.W.2d 892, 897 (Tex. App.–Austin 1998, pet. ref'd). A reviewing court must therefore recognize that the trial court is in a superior position to gauge the impact of the relevant evidence and not reverse a trial court's ruling if it is within the "zone of reasonable disagreement." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999); *Montgomery*, 810 S.W.2d at 391. In balancing probative value and unfair prejudice under rule 403 of the rules of evidence, an appellate court presumes that the probative value will outweigh any prejudicial effect. *Montgomery*, 810 S.W.2d at 389; *see* TEX. R. EVID. 403. It is therefore the objecting party's burden to demonstrate that the probative value is substantially outweighed by the danger of unfair prejudice. *Hinojosa v. State*, 995 S.W.2d

955, 958 (Tex. App.–Houston [14th Dist.] 1999, no pet.); *Poole*, 974 S.W.2d at 897.

## 2. Discussion

Requisite for review of any complaint on appeal is preservation of error. TEX. R. APP. P. 33.1(a); *Blue v. State*, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000). To preserve a complaint for appellate review, a party must present a timely request, objection, or motion to the trial court stating the specific grounds for the desired ruling if the specific grounds were not apparent from the context. *Adams v. State*, 180 S.W.3d 386, 399 (Tex. App.–Corpus Christi 2005, no pet.) (citing TEX. R. APP. P. 33.1(a); *Blue*, 41 S.W.3d at 131). The complaining party must also obtain an adverse ruling on the objection. *Id.* Generally, a party's failure to timely and specifically object at trial forfeits any error. TEX. R. APP. P. 33.1; *see Blue*, 41 S.W.3d at 131.

Appellant failed to object to Alvarado's testimony as to appellant's alleged drug dealing; therefore, we conclude that appellant failed to preserve that complaint for appeal. *See* TEX. R. APP. P. 33.1(a)(1); *see also Blue*, 41 S.W.3d at 131; *Montgomery*, 810 S.W.2d at 388.

On the other hand, appellant did object to Alvarado's testimony as to whether appellant was the leader of the HPL in 2004, alleging that Alvarado did not have personal knowledge of appellant's gang member status. The trial court overruled appellant's objection, and Alvarado testified that he had knowledge that appellant was the leader of the HPL in the Beeville area. On appeal, appellant has not adequately explained how the probative value of Alvarado's testimony as to appellant's gang member status was substantially outweighed by the danger of unfair prejudice. *See* TEX. R. APP. P. 38.1(h); *see also Montgomery*, 810 S.W.2d at 389; *Hinojosa*, 995 S.W.2d at 958; *Poole*, 974 S.W.2d at 897. Furthermore, it is noteworthy that other witnesses—namely, Lieutenant

24

Scott, Ruben, and Joe Quin—testified that appellant was the leader of the HPL in the Beeville area without objection from appellant. Therefore, it is not patently obvious from the record before us that Alvarado's testimony as to appellant's gang member status substantially prejudiced appellant's case. Accordingly, we overrule appellant's fourth issue.

## VI. Conclusion

Having overruled all of appellant's issues on appeal, we affirm the judgment of the trial court.

_____
DORI CONTRERAS GARZA,
Justice

Do not publish.
Tex. R. App. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 15th day of January, 2009.

25